# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

BONNY G. DURAN,                )
         Plaintiff,        )
                               )
v.                            )    No. 13 CV 50316
                               )    Magistrate Judge Iain D. Johnston
CAROLYN COLVIN, Acting        )
Commissioner of Social Security,  )
         Defendant.        )

## MEMORANDUM OPINION AND ORDER

Plaintiff Bonny G. Duran brings this action under 42 U.S.C. § 405(g), seeking reversal of the decision denying her social security benefits. As explained below, the decision is affirmed.

## BACKGROUND

In 2002, when she was around 21 years old, plaintiff was diagnosed with lupus or, more specifically, systemic lupus erythematosus ("SLE").[1] Also, in this general timeframe, plaintiff began having shoulder problems and over the years explored having surgery with two shoulder specialists, Dr. Trenhaile and Dr. Romeo. For at least part of this time, she was working full-time.

Her last full-time job, at Forrest City Countertops, ended in March 2009. There, she did payroll, answered phones, and obtained samples for customers to look at. R. 92. She left this job because it was physically and emotionally stressful. She had to periodically pick up pieces of

---

[1] "Lupus is a chronic inflammatory disease that occurs when your body's immune system attacks your own tissues and organs. Inflammation caused by lupus can affect many different body systems—including your joints, skin, kidneys, blood cells, brain, heart and lungs. Lupus can be difficult to diagnose because its signs and symptoms often mimic those of other ailments. The most distinctive sign of lupus—a facial rash that resembles the wings of a butterfly unfolding across both cheeks—occurs in many but not all cases of lupus." http://wwwmayoclinic.org/diseases-conditions/lupus (visited July 15, 2015).

slab countertops and sometimes had to help lift them into the truck to be taken to a customer's home. R. 93. Plaintiff alleges that her lupus got worse over the last years before she applied for benefits. After leaving this job, plaintiff worked part-time at a retail clothing store two days a week, four hours at a time.

Plaintiff filed her application for social security disability benefits on June 28, 2010, alleging a disability since March 25, 2009. R.21. In the years leading up to the filing of this application, she saw several doctors. The following is a summary of some of these visits.

From around 2008 (and perhaps even earlier) until June 11, 2010, plaintiff saw a rheumatologist, Dr. Frederick Dietz. *See* Ex. 4F. Dr. Dietz noted that plaintiff had lupus, as confirmed by blood work, and prescribed Plaquenil, an anti-malaria drug used to treat lupus. However, these visits focused mostly on plaintiff's shoulder with Dr. Dietz occasionally giving her a pain injection. Dr. Dietz did not seem to view her lupus symptoms as severe. For example, on November 30, 2009, he noted that plaintiff had no myopathy or synovitis and only occasional arthralgias (joint pain) in her hands. R. 352. He also noted that her shoulder motion was "full with minimal irritability" and did not give her a pain injection. He ordered lab studies to see "if she still has" lupus. *Id.*

The next and last visit with Dr. Dietz was, on June 11, 2010. Here are the key portions from his notes:

> Ms. Duran returns for reassessment and review. We have not seen her since January, and she has seen Dr. John Holtan for general care who told her that "life is tough" and that he would not prescribe pain medications. She would like a renewal of her Plaquenil. She has not had the eye examination that we told her it was necessary for continuation of her Plaquenil.
>
> She complains of pain all over, difficulty sleeping, and a great deal of stress. She has seen a psychologist multiple times in the past.

\*   \*   \*

> She states her pain is 7/10 all over her body. [] She is alert, oriented, and has a mild depressive affect. Her shoulders are tender, but range of motion is excellent. There is no evidence of synovitis in the hands, wrists, knees, or feet.
>
> The patient needs psychologic support that she will have to get from her primary care physician. I cannot prescribe Plaquenil until I get a normal eye examination. [] She looked interested in obtaining disability and she will have to talk to the orthopedic doctor regarding this.

R. 355.

Also on June 11, 2010, plaintiff saw Dr. Mark E. Hastings at Orthopaedic & Arthritic Clinic of Rockford. R. 346. Plaintiff had apparently been referred to him by Dr. Holtan, who was then her regular physician. Plaintiff was evaluated for bilateral shoulder symptoms. Dr. Hastings noted: "She works in sales and when she has to lift clothing it is uncomfortable for her." *Id.* He noted that she had been seen by Dr. Trenhaile in 2006 who felt that she might have a "tear." He also noted that she saw Dr. Romeo for a second opinion, and he felt she should have a surgical procedure, but she declined and instead wanted to try physical therapy. Dr. Hastings noted that x-rays of plaintiff's shoulder from November 2009 were unremarkable and that her MRI study from 2006 was negative as well.

Two weeks later, plaintiff filed her disability application, and then switched to a new regular physician and a new rheumatologist. Dr. Kara Cummins became her regular physician, with the first visit taking place on July 12, 2010. R. 423. Plaintiff told Dr. Cummins that, although she had seen several doctors about both her lupus and shoulder problems, she would like to get "another opinion" about both of these conditions. R. 424. Specifically, she wanted to see Dr. Olson for her lupus because her sister was seeing him. Dr. Cummins made a referral but did not appear to take any other action regarding plaintiff's lupus, although she noted that plaintiff had skin issues that "may be related to her lupus that seems to be quite active now." *Id.*

After this initial visit, it appears that plaintiff saw Dr. Cummins one more time—a visit on September 16, 2011 at which plaintiff complained only about diarrhea which in turn was diagnosed as hemorrhoids—before Dr. Cummins drafted the October 18, 2010 opinion letter that is discussed below. R. 421. This letter states in full:

> Bonnie Duran is a patient under my care. She currently has the following diagnoses: Systemic Lupus Erythematosis, Chronic Fatigue Syndrome, and Multidirectional Instability in both shoulders. Due to the disabling nature of these medical conditions, I feel that it is medically necessary that she receive Social Security Disability. If you have any further questions regarding this patient please feel free to call my office.

R. 460, *see also* R. 457 (duplicate).

In the fall of 2010, plaintiff saw Dr. Scott W. Trenhaile, who eventually operated on plaintiff's shoulder in January 2011. R. 485, 619. Before and after the surgery, plaintiff had numerous physical therapy visits where she did exercises, such as overhead reaches, to build up her strength.

On December 9, 2010, plaintiff began seeing Dr. Richard Olson, a rheumatologist at Rockford Orthopedic Associates. Plaintiff told Dr. Olson at the first visit that, although her lupus symptoms began in 2003, they had "intensified over the past year." R. 513. He diagnosed her with SLE, noting that she had "[c]urrent active synovitis hands and knees" but no complications with other organs. R. 514. Plaintiff subsequently visited Dr. Olson on December, 22, 2010, March 18, 2011, June, 2, 2011, August 30, 2011, October 5, 2011, and December 1, 2011. R. 526, 569, 605, 609, 690. In these visits, Dr. Olson generally noted that plaintiff had only mild lupus symptoms with no complications. As discussed below, Dr. Olson suspected that some of plaintiff's problems may be due to depression.

The administrative law judge ("ALJ") held two hearings. The first was on October 21, 2011. Plaintiff was then 30 years old. She testified that she was working two days a week, four

hours a day, at a retail clothing stores. R. 79. About once every two weeks, she would call in to work saying that she was going out of town or had plans, although the real reason was that she had a lupus flare. R. 80-81. She received no special breaks or accommodations different from those given to other workers. R. 82. When asked whether she gets to sit during her four-hour shift, she stated: "No, I'm standing." R. 81.

After the first hearing, the ALJ decided to convene a second one, which was held on January 5, 2012, and Dr. Ernest Mond, a retired internal medicine physician, testified as an impartial medical expert. He opined that plaintiff's lupus would not meet the listing for lupus because her symptoms were mild with only her joints involved and "there's no renal involvement, no central nervous system involvement, no skin involvement, no cardiovascular involvement." R. 47. He noted that lab tests had shown on multiple occasions that her lupus was not active. R. 49. As for the January 2011 shoulder surgery, he noted that plaintiff was given physical therapy and had gradually improved. He also conjectured that there "is an element of depression," one which did not seem to be "overwhelming," although he noted that he was not a psychiatrist.[2]

On March 14, 2012, the ALJ issued his decision denying plaintiff's application. He found that plaintiff's shoulder problems and lupus qualified as severe impairments, but not her depression, which he also found did not meet a listing. In reaching the latter conclusions, he relied on the report of examining psychologist Dr. Mark Langgut, who (according to the ALJ) found that plaintiff only had mild symptoms of depression even though she reported that she was experiencing an 8 on a 10-point scale, meaning she was close to suicidal. R. 25; Ex. 12F.[3]

---

[2] Curiously, later in his opinion, the ALJ largely ignored this testimony based on the fact that Dr. Mond was retired for 12 years. R. 29.

[3] Dr. Langgut diagnosed plaintiff with dysthymic disorder (mild depression). R. 438.

The bulk of the opinion focused on the RFC analysis where the ALJ found that plaintiff was able to perform light work. The ALJ summarized the medical record and set forth numerous reasons for his decision, some of which are addressed in the context of plaintiff's arguments below. At step five, the ALJ found that plaintiff was capable of performing past relevant work as a receptionist and customer service clerk. R. 29. As a receptionist, plaintiff had no lifting requirements and had to walk and stand one hour per day. R. 30. She had the same limitations in her job as a customer service clerk.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). If the Commissioner's decision lacks evidentiary support or adequate discussion, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build

an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). And, as the Seventh Circuit has repeatedly held, the federal courts cannot build the logical bridge on behalf of the ALJ. *See Mason v. Colvin*, 2014 U.S. Dist. LEXIS 152938, at *19 (N.D. Ill. Oct. 29, 2014) ("In the Seventh Circuit, an ALJ's decision can be supported by substantial evidence – or even a preponderance of the evidence, as it is here – but still will be overturned if the ALJ fails to build a 'logical bridge' from the evidence to her conclusion."); *Jensen v. Colvin*, 2013 U.S. Dist. LEXIS 135452, at *33-34 (N.D. Ill. 2013).

Plaintiff does not challenge the ALJ's finding that she failed to meet the listing for lupus, nor that her dysthymia was neither a severe impairment nor met a listing. Instead, she focuses on the RFC finding, raising two arguments.

## I.    Errors In Interpreting The Evidence

In her first argument, plaintiff identifies five evidentiary errors and four errors in the credibility analysis. The Court will address them in the order presented.

### A.  Errors In Characterizing The Medical Record

#### 1.  "Declined to perform surgery"

Plaintiff complains that the ALJ unfairly gave the impression that Dr. Hastings, who plaintiff consulted on June 11, 2011, refused to operate on plaintiff's shoulder because he doubted whether it was necessary when in fact the reason was he was not equipped to do the surgery. Here is how the ALJ summarized this evidence:

> Clinically, these physicians respectively commented upon *the absence* of objective shoulder instability (3F/2) or wrist synovitis (4F/5). The claimant at the time was working in sales. Dr. [Hastings][4] declined to perform surgery, acknowledging that someone else might be willing. Scott Trenhaile, M.D.[,] eventually performed the surgery in January 2011 (20F/145).

---

[4] The ALJ inadvertently referred to the doctor as Dr. Holtan, rather than Dr. Hastings, an error plaintiff agrees is not material.

R. 27 (emphasis in original). Here is the "Impression" section from Dr. Hastings' June 11th notes where he explains why he did not do the surgery:

> Ms. Duran does have an element of instability based upon her history. She has already seen two expert shoulder physicians, Dr. Trenhaile and Dr. Romeo. Her treatment options at this time are to revisit physical therapy or pursue a surgical procedure. I informed her I am not equipped to handle multi-directional instability in a 28-year-old. I recommend [that] she return to Dr. Trenhaile or Dr. Romeo to be evaluated for such a procedure. She is agreeable. We discussed she will probably need a new MRI study before any procedure, but we will leave that to the discretion of her future treating orthopaedic surgeon.

R. 347. This is perhaps plaintiff's best argument. The ALJ's description arguably creates a misimpression by omitting the part where Dr. Hastings stated that he is "not equipped to handle" this surgery. However, at the same time, it is not entirely clear what Dr. Hastings meant by this phrase, and his other comments, such as his recounting of plaintiff's visits to two earlier expert surgeons, suggest he may have had some doubts after all. In any event, the ALJ did not emphasize this point, nor even explicitly state that he was placing weight on Dr. Hastings' decision to decline surgery. The ALJ's statement is not strictly inaccurate, and any negative aspersion is mitigated by the immediately-following fact that Dr. Trenhaile agreed to do the surgery. When viewed within the broader context of the opinion, the Court finds that any mis-impression created by this one sentence is a harmless error.

## 2. "Lifting boxes of jeans"

Plaintiff next complains that the ALJ incorrectly stated that she lifted "boxes of jeans" at her part-time job when in fact the medical record states that she lifted "boxes or jeans." Dkt. #17 at 8 (emphasis in original). The medical record serving as the source for this statement is the following sentence from one of plaintiff's physical therapists: "Patient is currently part time in retail. Difficult with the lifting of boxes or stack of jeans." R. 495. Plaintiff is correct that the

ALJ's description is not technically accurate, as he left out the phrase "or stack" from the phrase "boxes or stack of jeans." But plaintiff's description is also not entirely accurate, as she left out the phrase "stack of." So, is the ALJ's description of a "box of jeans" misleadingly different from a "stack of jeans"? The Court finds that this difference is minor at best and not the basis for a remand, even if combined with other alleged errors. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) ("Rather than nitpick the ALJ's opinion for inconsistences or contradictions, we give it a commonsensical reading.").

### 3. Plaintiff's Health Was Good In 2007

Plaintiff complains next about this passage in the opinion: "It bears remarks that the claimant's lupus and shoulder problems have been present since at least 2007, when surgery also was recommended. Nevertheless, at that time, by contrast with now, she represented the state of her health as 'good' (24F-23,6)." Plaintiff does not dispute the accuracy of the statement, but asserts that the state of her health in July 2007 is irrelevant because it was 20 months before her onset date. Plaintiff is essentially arguing that this fact cannot be considered at all. This Court is not persuaded, and plaintiff has cited no case to this effect. There is no suggestion that the ALJ did not understand that the onset date was later. It is true that plaintiff claimed that her lupus became worse in the year or two before she applied for benefits. But whether this was true, and if so, how much it deteriorated, are central issues in this case. Again, there is no suggestion that the ALJ gave this one fact undue weight out of the many he considered and discussed in his opinion.

### 4. Dr. Dietz Noting That Plaintiff Was Active

Plaintiff next complains about this sentence: "The claimant had been *lupus active* in July 2010, September 2010 and November 2010, but she *also* apparently had been *very active* in June 2010 when her former rheumatologist Frederick Dietz, M.D., wrote that he had not seen her in

six months." R. 27 (citations omitted; emphasis added). This is admittedly a fairly long sentence, with a somewhat confusing chronology. The Court is not sure it understands plaintiff's argument.  As this Court interprets it, plaintiff apparently believes that the ALJ used the word "active" two different ways, with the first reference (lupus active) signaling that her health was getting worse and the second reference (very active) showing that her health was good because she was active. Plaintiff believes that the latter interpretation is not justified because plaintiff told Dr. Dietz in June 2010 that she had pain all over, difficulty sleeping, and a great deal of stress and because Dr. Dietz in his notes never indicated that plaintiff was "very active." This Court reads the sentence differently.  The Court understands the ALJ to be stating that, although *plaintiff reported* that her lupus was active, Dr. Dietz had some doubt about whether the lupus was active (not whether plaintiff herself was physically active) because Dr. Dietz in the preceding paragraph in his notes stated that "[w]e have not seen [plaintiff] since January [*i.e.* in six months], and she has seen Dr. John Holtan for general care who told her that 'life is tough' and that he would not prescribe pain medications." R. 355.[5] Plaintiff's argument instead seems to rest on an unnatural reading of the sentence.

### 5.  Dr. Cummins' Notes Do Not Comment On Fatigue Or Discomfort.

The fifth alleged error is based on the following sentence: "From a medical standpoint, primary care physician Kara Cummins, M.D., had maintained claimant on Plaquenil and made the referrals for rheumatology/orthopedic consult. Nevertheless, her chart notes do not comment on fatigue or discomfort." Plaintiff argues this statement is inaccurate.  She states that she told Dr. Cummins' nurse during the first visit that she had "pain all over," that Dr. Cummins wrote in her notes that plaintiff's shoulder pain makes it hard to sleep at night, and that plaintiff told two

---

[5] It is worth noting that plaintiff testified that she is in frequent contact with her doctors if "there's an issue" with her lupus. R. 77.

other healthcare providers similar statements on November 1st and 2nd of 2010. Dkt. # 17 at 10. While these facts may be true, they do not directly contradict the ALJ's statements. Except for the statement about shoulder pain and sleeping, the comments were not made to Dr. Cummins. In her notes, Dr. Cummins made the one notation about pain and sleeping, but on the following page she did not mention the fatigue or discomfort in the assessment portion. Thus, arguably, she did not comment on these facts. Plaintiff's other argument is that in Dr. Cummins' October 18, 2010 opinion letter she states that plaintiff was diagnosed with chronic fatigue syndrome. This point is true, but it still does not contradict the ALJ's precise statement, which focused on the doctor's "chart notes." These notes do not appear to contain a diagnosis of chronic fatigue syndrome. Perhaps it is simple inadvertence, but the ALJ was still free to infer that it reflected a belief by the doctor that plaintiff's chronic fatigue was not noteworthy enough to be included as a formal diagnosis in her notes.

### B. Credibility Errors.

The next four errors relate to plaintiff's credibility. As plaintiff summarizes in her brief, an ALJ's credibility determination is afforded deference, but a remand is required if there are serious errors in reasoning. Dkt. #17 at 11 (citing *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)).

#### 1. Why She Missed Work

The ALJ noted, as one of several reasons for discounting plaintiff's credibility, that when she needed to miss work because of health problems, she would tell her supervisor she was going out of town. Plaintiff argues that it was "quite ironic" for the ALJ to rely on this statement because it was made "in an attempt to keep her job." Dkt. # 17 at 11. However, plaintiff does not explain why telling this lie would make it easier to keep her job. Would an employer be more

upset if an otherwise hard-working employee repeatedly called in sick because her chronic illness flared up or would it be better if this same employee repeatedly called in to announce last-minute out of town trips that required missing work? The answer is not obvious. Plaintiff worked at this job for 32 months and described herself as having developed a "friendship" with her employer. In sum, although this Court does not find that plaintiff's false statements about missing work were egregious, this Court also does not find any reason why the ALJ was forbidden to consider them along with all the other evidence.

## 2. Cannot Comb Her Hair

Plaintiff argues that the ALJ wrongfully stated that she testified she was "not able to comb her hair."[6] R. 28. Plaintiff argues that she merely testified that it was "painful" to comb her hair. Here again, the Court finds that plaintiff's argument rests on what is essentially a semantic quibble. As plaintiff recognizes, although the ALJ stated that at one point in the opinion that she was "not able" to comb her hair, the ALJ at a later point stated that it was "painful," which is the characterization plaintiff believes is most accurate. At yet another point in the opinion, the ALJ stated that plaintiff found combing her hair "problematic." These verbal formulations are not all that different. In any event, there is evidentiary support for the ALJ's characterization. At the second hearing, the ALJ asked "are you able to comb your hair?" and plaintiff answered: "No, not really, like it hurts to a point where my shoulder kind of feels like it's tearing a little bit[.]" R. 43. This enough to support the ALJ's interpretation.

---

[6] The ALJ found that this statement was not credible in light of the other things plaintiff was doing, such working in a part-time job for 32 months where she had been lifting things on a regular basis and doing physical therapy involving reaching overhead 20 times with 2 to 4 pound weights. R. 27.

### 3. Went For A Run One Time

The ALJ noted several times that, although plaintiff claimed she was physically inactive, one of her physical therapists noted in April 2011 that she came in to therapy reporting shoulder problems that she attributed to "going out for a run yesterday without thinking about her shoulder." R 585. At the hearing, plaintiff told the ALJ this was an isolated instance, and that she only tried running on this one occasion because her therapist encouraged her to be active. These two explanations are arguably at odds with each other, but in any event the ALJ apparently did not believe plaintiff's testimony about it being an isolated incidence. The wording of the therapist's notes does not contain any indication that plaintiff's running was an unusual or first-time event. Moreover, there is other evidence (see below) providing some corroboration. This Court is not in a position to second-guess this finding as there is some evidence to support it.

### 4. Hobbies Of Running, Swimming, And Bicycling.

Related to the above point, the ALJ noted that plaintiff advised Dr. Olson in June 2011 that "her hobbies included running, swimming and bicycling," which the ALJ concluded "would imply that they were current pursuits." R. 28. It appears that plaintiff gave this answer to a background-type question, perhaps posed by the nurse, as it is set forth in the left-hand column separate from the doctor's notes and is included along with other questions asking about plaintiff's employment, alcohol use, marital status, and "Activities/Hobbies." R. 605-06. Plaintiff does not dispute that she stated that her activities and hobbies included running, swimming, and bicycling. But she complains that these "were nothing but listings" (the Court is not sure what this means) and argues that the ALJ took the "convenient step" of "implying" that the hobbies were "current pursuits." Dkt. # 17 at 12. This is probably an accurate summary of the ALJ's reasoning, but plaintiff does not explain why it was improper or why she would

answer this way if she believed she was permanently disabled.  And even if plaintiff were not currently doing these activities, because of a temporary lupus flare-up for example, the fact that she still self-identified as a runner might speak to her view of whether she would likely resume this hobby after the flare-up.[7] The Court does not find that the ALJ was unreasonable in assuming, based on the way these doctor's notes were written, that plaintiff's answer was not merely referring to old hobbies, but to current ones. Plaintiff argues that the ALJ "could not point out one record which noted running, swimming, or bicycling, other than the brief 'run' mentioned above." *Id.* at 12-13. While plaintiff might find only two pieces of evidence to be not sufficiently persuasive, the Court does not find that this is a reversible error, especially since the ALJ relied on numerous other arguments, such as the fact that plaintiff could stand continuously for four hours at her job, as evidence that she had the physical ability to do a sedentary job.[8]

In sum, the Court finds that none of the above alleged errors, either singly or in combination, cast sufficient doubt on the ALJ's decision.

---

[7] There is another potential discrepancy in plaintiff's response to these same background questions. In Dr. Olson's notes from the visit on December 1, 2011, it states that plaintiff was then working part-time, one day a week. R. 690. But she represented to the ALJ that she had quit this job on Nov. 15, 2011. R 24 ("The claimant notified the undersigned two days before [the] supplemental January 5, 2012 hearing that her job as a sales associate ended on November 15, 2011."); *see also* R. 44 ("Q. When did that work end? A:  [] November 15th, I believe, was my last day"). However, because the ALJ did not comment on this possible discrepancy, this Court cannot rely on it now, and it is possible plaintiff has some explanation.

[8] Although not cited by the ALJ, there is indeed other evidence in the record suggesting that plaintiff continued to exercise after being diagnosed with lupus. For example, she saw Dr. Dietz on March 25, 2008, complaining about acute left hip pain. R. 356. In exploring possible causes of the hip pain, Dr. Dietz noted that plaintiff reported that she "[d]oes workouts on a regular basis." Similarly, on December 9, 2010, Dr. Olson wrote in his notes (not in the background part done by the nurses) that plaintiff was currently doing regular exercise. R. 513 ("*Current activities* include works four hours in sales doing a lot of standing, housework, child care with son who is age nine, *regular exercise* including physical therapy two to three times weekly for treatment of neck and bilateral shoulder pain.") (emphasis added).

- 14 -

## II.    Failure To Follow The Treating Physician Rule

Plaintiff's second argument is that the ALJ failed to give controlling weight to two of her treating physicians, Dr. Cummins and Dr. Olson. Plaintiff believes that the ALJ committed evidentiary errors and also failed to follow the treating physician rule.  20 C.F.R. § 404.1527(c)(2).

The treating physician rule is part of a larger process by which the Social Security Administration ("SSA") weighs medical evidence, including opinions from various sources.  The starting point is the language of the regulations.  The regulations make the following representations to claimants seeking benefits:  "Regardless of its source, we *will* evaluate *every* medical opinion we receive." 20 C.F.R. § 404.1527(c) (Emphasis added.)  Rules of statutory construction establish that this language is mandatory. *Airadigm Communications, Inc. v. F.C.C.*, 519 F.3d 640, 656 (7th Cir. 2008) ("will" is mandatory); *Wiljef Trans., Inc. v. N.L.R.B.*, 946 F.2d 1308, 1312 (7th Cir. 1991) (same); *see also Hewitt v. Helms*, 459 U.S. 460, 471-72 (1983) ("will" is mandatory) *rev'd on other grounds Sandin v. Connor*, 515 U.S. 472 (1995).  The regulations go on to tell claimants that the SSA decision makers "consider *all*" of the following factors in deciding the weight to give to *any* medical opinion: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(6).  These are the "checklist factors." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).  The checklist factors are designed to help the ALJ "decide how much weight to give to the treating physician's evidence." *Id.*  But within the weighing process, treating physician opinions receive particular consideration.  A treating physician's opinion is

entitled to controlling weight if it is supported by medical findings and consistent with other

substantial evidence in the record. *Id.*; *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014).

The regulations couch the treating physician rule in the follow bureaucratic jargon: "If we find

that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in your case record, we will give it controlling

weight." 20 C.F.R. § 404.1527(c)(2). If the ALJ does not give the treating physician's opinion

controlling weight, the ALJ cannot simply disregard it without further analysis. *Campbell v.*

*Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). Instead, the ALJ must determine what specific weight,

if any, the opinion should be given. *Moss v. Astrue*¸ 555 F.3d 556, 561 (7th Cir. 2009). To make

this determination, the ALJ must apply the checklist of factors set forth in 20 C.F.R.

§ 404.1527(c)(2). *Campbell*, 627 F.3d at 308; *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).

Accordingly, the treating physician rule provided by the regulations establishes a two-

step process. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011) ("Our case law, the

applicable regulations, and the Commissioner's pertinent Social Security Ruling (SSR), all make

clear that in evaluating medical opinions of a claimant's treating physician, the ALJ must

complete a sequential two-step inquiry, each step of which is analytically distinct."); *Smith v.*

*Colvin*, 2015 U.S. Dist. LEXIS 41101, at *27 (S.D. Ind. Mar. 30, 2015) (referring to the process

as "a bifurcated analysis"). First, the ALJ must determine whether to give the treating

physician's opinion "controlling weight," by evaluating the opinion in light of its supportability

as shown by medical tests and consistency with other evidence in the record. 20 C.F.R.

§ 404.1527(c)(2). Second, if the ALJ finds that the treating physician's opinion is not entitled to

controlling weight, then the ALJ must apply the checklist factors to determine what, if any, weight to give to the opinion. 20 C.F.R. § 404.1527(c)(2)(1) – (6).

Setting aside that the *substance* of the rule is contradictory, *see Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006), the *process* by which the rule is applied to the opinion is straightforward. And a reasonable person would think that because of the number of times each week ALJs determine the weight to give to a treating physician's opinion, the ALJs would be able to apply this procedure without much difficulty. (Again, here, this opinion focuses on process.) Unfortunately, ALJs bungle the process – as the ALJ did here – on a regular basis. *See, e.g.*, *Collens v. Astrue*, 324 Fed. Appx. 516, 522 (7th Cir. 2009) ("As [the claimant] points out, hers is not the first case in which this particular ALJ has misstated the treating-physician rule."). In this case, the ALJ did not apply the clear two-step process. Instead, the ALJ conflated the process into a single, amalgamated discussion without so much as applying the regulations. R. 26-29.[9] First, the ALJ did not say one word about the process of determining if the treating physicians' opinions would be given controlling weight. Second, even after blasting right past the "controlling weight" determination without a word, the ALJ never laid out the checklist, and certainly did not explicitly apply the checklist, even after ignoring the first step. R. 26-29.

The constant failure to simply apply the two-step process in a clear manner has resulted in two distinct – and difficult to reconcile – lines of cases in the Seventh Circuit. One line of cases is more forgiving of the ALJ's procedural snafu. *See, e.g., Schreiber v. Colvin*, 519 Fed. Appx. 951 (7th Cir. 2013); *Henke v. Astrue*, 498 Fed. Appx. 636 (7th Cir. 2012); *Elder v. Astrue*,

---

[9] In the relevant section of the decision, there is a single boiler-plate, conclusory reference that the ALJ "considered" the regulations. R. 26.

529 F.3d 408 (7th Cir. 2008).[10]  The other line of cases is much more restrictive.  *See, e.g., Yurt v. Colvin*, 758 F.3d 850 (7th Cir. 2014); *Campbell v. Astrue*, 627 F.3d 299 (7th Cir. 2010); *see also Larson v. Astrue*, 615 F.3d 744 (7th 2010); *Moss v. Astrue*, 555 F.3d 556 (7th Cir. 2009).  According to these restrictive decisions, the ALJ *must* consider the *required* checklist.  Unfortunately, the Seventh Circuit has not recognized, let alone harmonized these distinct lines of cases.

The genesis of the more forgiving line of cases is *Elder v. Astrue*, 529 F.3d 408 (7th Cir. 2008).  In that case, the claimant waived the issue that her treating physicians' opinions were entitled to controlling weight; however, the Seventh Circuit conducted the analysis and found that the opinions were not entitled to controlling weight.  *Elder*, 529 F.3d at 415.  More importantly for purposes of this case, the Seventh Circuit found that the ALJ did not err in failing to give "substantial weight" to the treating physicians' opinions. *Id.* at 416.  In doing so, the Seventh Circuit noted that the ALJ found that the treating physicians (a) were not specialist in the relevant field, and (b) failed to support their opinions with a medical exam. *Id.*  These are only two of the six checklist factors, but the Seventh Circuit affirmed.  *Id.*

---

[10] Both *Schreiber* and *Henke* are unreported decisions that "are not treated as precedents". Seventh Circuit Rule of Appellate Procedure 32.1.  But district courts often rely upon these cases in forgiving the ALJs' less-than stellar application of the treating physician rule.  *See, e.g. Smith v. Colvin*, 2015 U.S. Dist. LEXIS 41101, at *27 (S.D. Ind. Mar. 30, 2015) (relying, in part, on *Henke* to affirm ALJ's decision that "was not a model of thoroughness"); *Crumpler v. Colvin*, 2014 U.S. Dist. LEXIS 82555, at *43 (C.D. Ill June 18, 2014) (relying on *Schreiber* and *Henke* to affirm despite ALJ not explicitly applying checklist factors).  In contrast, other district court decisions have recognized the forgiving line of cases, but, nevertheless, remanded because of the ALJ's failure to properly apply the checklist to the treating physician's opinion. *See, e.g., Cagle v. Colvin*, 2015 U.S. Dist. LEXIS 10948, at *21-22 (N.D. Ind. Jan. 29, 2015) (remanding because ALJ paid "too little attention to the factors"); *Ledbetter v. Colvin*, 2014 U.S. Dist. LEXIS 137648, at *14 (S.D. Ind. Sept. 29, 2014); *Cherry v. Colvin*, 2014 U.S. Dist. LEXIS 100390, at *6-7 (C.D. Ill. June 30, 2014) (citing *Henke* but still finding the ALJ's analysis to be lacking).

Building on *Elder*, the Seventh Circuit, in *Henke v. Astrue*, again found that the ALJ did not err in failing to give "substantial weight" to a treating physician's opinion. In doing so, the Seventh Circuit stated the following:

> The ALJ did not *explicitly* weigh *every* factor while discussing her decision to reject [the treating physician's] reports, but she did note the lack of medical evidence supporting [the doctor's] opinion, *see* 20 C.F.R. § 404.1527(d)(3) (2009), and its inconsistency with the rest of the record, *see id.* § 4041527(d)(4). This is enough. *See Elder*, 529 F.3d at 415-16 (affirming denial of benefits where ALJ discussed only two of the relevant factors laid out in § 404.1527(d)).

*Henke*, 498 Fed. Appx. at 640 n.3. (Emphasis added.) Thus, in *Henke*, the Seventh Circuit added the concept that the ALJ need not explicitly weigh every factor.

Most recently, in *Schreiber v. Colvin*, 519 Fed. Appx. 951 (7th Cir. 2013), the Court expanded the holdings of *Elder* and *Henke*. In both of those cases, the specific issue before the Court was whether the ALJ erred in not giving "substantial weight" to the treating physicians' opinions. The *Schreiber* court went further. In *Schreiber*, the claimant argued "that the ALJ failed to properly analyze [the treating physician's] opinion because he did not specifically address each factor set forth in 20 C.F.R. § 404.1527." 519 Fed. Appx. at 959. The Seventh Circuit rejected that argument:

> Here, while the ALJ did not explicitly weigh each factor in discussing [the treating physician's] opinion, his decision makes clear that he was aware of and considered many of the factors, including [the treating physician's] treatment relationship with [the claimant], the consistency of her opinion with the record as a whole, and the supportability of her opinion. See 20 C.F.R. § 404.1527(c). While we may not agree with the weight the ALJ ultimately gave [the treating physician's] opinions, our inquiry is limited to whether the ALJ sufficiently accounted for the factors in 20 C.F.R. § 404.1527, *see Elder v. Astrue*, 529 F.3d 408, 415-16 (7th Cir. 2008) (affirming denial of benefits where ALJ discussed only two of the relevant factors laid out in 20 C.F.R. § 404.1527). . . We find that deferential standard is met here.

*Schreiber*, 519 Fed. Appx. at 959.

Accordingly, under the forgiving line of cases, the ALJ need not explicitly weigh each factor, but instead need only "sufficiently account for the factors." This line of cases allows the ALJ to conduct a modestly documented drive-by review of some of the checklist factors.

The more restrictive line of cases stakes out some easy ground. If "the ALJ [says] nothing of the required checklist of factors," then remand is sure to follow. *Larson*, 615 F.3d at 751. Likewise, if the ALJ made its decision as to the weight of the treating physician's opinion "without any consideration of the factors outlined in the regulations," the case will be remanded. *Moss*, 555 F.3d at 561. Thus, a clear failure to apply the checklist results in reversal. *Collins*, 324 Fed. Appx. at 521 ("The ALJ did not apply these regulations."). But this restrictive line of cases goes further, requiring the ALJ to *explicitly* address the checklist factors. *See Yurt*, 758 F.3d at 860 (on remand, "the ALJ should explicitly consider the details of the treatment relationship and provide reasons for the weight given to [the treating physicians'] opinions," citing 20 C.F.R. § 404.1527(c)(2)). The restrictive line of cases is best exemplified by *Campbell v. Astrue*, 627 F.3d 299 (7th Cir. 2010). Like the decision in this case, the ALJ's decision in *Campbell* stated that "she considered opinion evidence in accordance with . . . § 404.1527." *Campbell*, 627 F.3d at 308. This alleged consideration was insufficient for the Seventh Circuit. According to the *Campbell* court, "the decision [did] not *explicitly* address the checklist of factors as applied to the medical opinion evidence." *Id.* (Emphasis added.) Consequently, this restrictive line of cases requires the ALJ to explicitly consider the checklist factors.

If forced to choose, this Court would side with the more restrictive line of cases, particularly under the facts presented here. First, the restrictive line of cases is more consistent with the regulations. *Wilson v. Comm'r of Social Security*, 378 F.3d 541, 545 (6th Cir. 2004) (SSA bound by its own regulations regarding treating physician's rule). Second, *Elder* can be

limited to the issue of whether the ALJ erred in not giving "substantial weight" to the treating physician's opinion, rather than the broader question of whether the ALJ must explicitly consider the factors.  Third, both *Schreiber* and *Henke* are unpublished, non-precedential opinions, governed by Seventh Circuit Rule 32.1.

However, at this time, the Court will not pick sides.  Instead, the Court chooses to *sua sponte* invoke the harmless error doctrine.  *Alvey v. Colvin*, 536 Fed. Appx. 792, 794 (10th Cir. 2013); *Smith v. Colvin*, 2015 U.S. Dist. LEXIS 33462, at *11 n. 2 (W.D. Okl. Feb. 23, 2015); *Mangan v. Colvin*, 2014 U.S. Dist. LEXIS 120515, at *2 (N.D. Ill. Aug. 28, 2014).  The Court is confident that remand on this issue is not necessary.

Although plaintiff complains that the ALJ did not explicitly apply the factors, the plaintiff only offers two brief arguments as to what further analysis is supposedly needed. First, plaintiff complains that the ALJ failed to recognize Dr. Olson's specialty as a rheumatologist in treating lupus. As an initial point, the ALJ was aware of this fact, as he explicitly referred earlier in the opinion to Dr. Olson as plaintiff's "current rheumatologist" and further summarized technical, lupus-related findings the doctor made. More substantively, plaintiff's argument overlooks the point made above—namely, that the ALJ discounted the portion of the doctor's opinion relating to depression, an issue outside of his specialty. The ALJ did not question Dr. Olson's specific findings about lupus, and in fact, credited them. *See, e.g.*, R. 28 (summarizing Dr. Olson's observations about plaintiff's foot x-rays, her extremity strength, her range of motion).

Second, plaintiff summarily states that she "had a long-standing treatment relationship" with these doctors. Dkt. # 25 at 6. But she does not elaborate.  Plaintiff consulted both of these doctors after she filed her disability application and she has not cited to the opinions of the various doctors who treated her before then. As far as this Court can tell, she saw Dr. Cummins

for only two visits, neither of which involved any significant issues or tests, before Dr. Cummins wrote the one-paragraph opinion letter. This does not fit within this Court's view of a long-standing relationship; if anything, it supports the ALJ's conclusion. Plaintiff saw Dr. Olson periodically from December 2010 to October 2011. Whether this qualifies as "long-standing" is subject to debate, but even if it is, as noted above, the ALJ was permitted to discount the portion of the opinion relating to depression.

As for the other checklist factors, plaintiff does not raise any objections. The Court's independent review of the ALJ's analysis shows that it was not the model of clarity or thoroughness. But the ALJ analyzed how the doctor's opinions were supported by or consistent with the overall evidence (factors three and four) and mentioned other factors that tended to support or contradict the opinion (factor six). For example, the ALJ noted that Dr. Cummins' belief that plaintiff's physical abilities were limited was inconsistent with the ALJ's finding that plaintiff was "[j]ogging, lifting boxes of jeans and performing light sales associate work for 32 months after onset." R. 29. The Court is confident that a remand is unnecessary.

In the interest of completeness, the Court will, nevertheless, address plaintiff's specific criticisms of the ALJ's decision concerning each doctor.

**A. Dr. Olson**

On October 5, 2011, Dr. Olson, plaintiff's second rheumatologist, filled out a form entitled "Lupus (SLE) Residual Functional Capacity Questionnaire." Ex. 25F. He answered various questions about plaintiff's physical abilities. He did not offer any bottom-line conclusions about whether plaintiff could work. The ALJ devoted four paragraphs to explaining why he gave this opinion only minimal weight.

Plaintiff now complains really about only one specific aspect of the analysis. The ALJ noted that Dr. Olson's answers to the questionnaire were based not only on plaintiff's lupus, but also the doctor's conclusion that plaintiff also had insomnia and chronic fatigue. R. 28, 677. The ALJ further noted that, in his patient notes, Dr. Olson "speculated that fatigue and discomfort were due to depression, which is not a medical opinion within his purview." R. 28. In other words, the ALJ discounted Dr. Olson's opinion to the extent that he was opining about a matter (depression) outside his expertise as a rheumatologist. Plaintiff claims this was unfair and unsupported by the evidence. Specifically, plaintiff argues that the ALJ wrongly "claimed [that] Dr. Olson speculated that [plaintiff's] fatigue and discomfort were due to depression, whereas Dr. [Olson] only indicated depression was a component, not the sole cause of her chronic fatigue." Dkt. # 17 at 13.

As with plaintiff's earlier arguments, this Court finds that this one turns on a slight distinction in wording. In the sentence quoted above, plaintiff seems to be making several subtle—and frankly, hard to discern—distinctions between Dr. Olson *speculating* versus *indicating* something and between him concluding that depression was a *cause* (as indicated by the words "due to") versus concluding that it was only a *component* of the fatigue. The Court finds that the ALJ did not misconstrue the underlying evidence, as plaintiff asserts. Here is the passage the ALJ relied on from Dr. Olson's patient notes on October 5, 2011, the same day he filled out the questionnaire: "Malaise and Fatigue – 780.79, suspect component of depression. Recent labs did not suggest active [lupus]." R. 687. The word "suspect" (used by Dr. Olson) is very close to "speculated" (the ALJ's word). This is not a mischaracterization of the evidence.

To the larger point, whether depression and the related fatigue and insomnia were factors in why plaintiff did not feel she could work, there is evidence to support the ALJ's conclusion.

When asked at the first hearing why she could not work, plaintiff answered: "Because I'm in a lot of pain in my joints, and I'm very fatigued. Also, *I'm somewhat emotional and depressed in a way*, and I have inflammation like in my hands and it's kind of hard to work with them." R. 76-77 (emphasis added). Dr. Dietz, a rheumatologist who treated plaintiff over a longer period than Dr. Olson, consistently pointed to plaintiff's depression as being a key issue. For example, at the January 2010 visit, he noted that "fatigue will continue to be a problem until she gets more happiness in her life." R. 354.

It is worth noting, finally, that the ALJ cited to several other reasons for discounting Dr. Olson's opinion, none of which plaintiff challenges. For example, the ALJ referred to the fact that in the Lupus questionnaire, Dr. Olson answered the question "To what degree can your patient tolerate work stress?" by circling "Capable of low stress jobs." R. 679. He did not circle "Incapable of even 'low stress' jobs." This suggests that he believed plaintiff was able to do some type of work. Dr. Olson also answered yes to the question of whether "emotional factors" contributed to the severity of plaintiff's work limitations. *Id.*

**B. Dr. Cummins**

The ALJ devoted less attention to Dr. Cummins' opinions, which consisted of both an RFC questionnaire similar to the one filled out by Dr. Olson and also the more direct, one-paragraph opinion letter. *See* Exs. 15F, 23F. Plaintiff points to one specific alleged error. Plaintiff faults the ALJ for doubting Dr. Cummins' opinion that plaintiff could only stand for 45 minutes based on the ALJ's belief that this opinion was inconsistent with plaintiff's own testimony that she could stand four hours straight at her part-time job. Plaintiff argues that Dr. Cummins' opinion was based on her projection of plaintiff working full-time. However, it is not clear that Dr. Cummins was adjusting her answer for this fact. The questions are specific and this

particular one merely asks how long plaintiff could stand before changing positions.  R. 656.

This Court does not find that the ALJ's reasoning is erroneous, nor one warranting remand.  The

ALJ was aware that plaintiff's ability to stand four hours a day was done only twice a week, but

this does not mean that the ALJ could not consider it at all in the analysis. In sum, the Court is

not persuaded by plaintiff's argument on this point.

## CONCLUSION

The Court sincerely hopes that the Commissioner will address with its ALJs the

apparently systemic failure to properly analyze treating physicians' opinions under the SSA's

own regulations.  The Court is also hopeful that the Seventh Circuit will harmonize the two

distinct lines of cases that have developed as a result of this failure.

For the reasons given, plaintiff's motion for summary judgment is denied, the

government's motion is granted, and the decision of the ALJ is affirmed.

Date:  August 4, 2015          By:

Iain D. Johnston
United States Magistrate Judge